No. 13-4300

# United States Court of Appeals
## For the
## Third Circuit

In Re: Google Inc. Cookie Placement Consumer Privacy Litigation

*On Appeal from the United States District Court for the District of Delaware in Case No. 1:12-md-02358-SLR Honorable Sue L. Robinson*

## AMENDED REPLY BRIEF OF APPELLANTS

**Bartimus, Frickleton, Robertson & Goza, P.C.**
James P. Frickleton
Edward D. Robertson, Jr.
Mary D. Winter
Edward D. Robertson, III
11150 Overbrook Rd., Suite 200
Leawood, KS  66211
913-266-2300
jimf@bflawfirm.com
chiprob@earthlink.net

**Stephen G. Grygiel** (DE Bar ID #4944)
88 East Bergen Place
Red bank NJ 07701
407-505-9463
Sggrygiel@yahoo.com

**Strange & Carpenter**
Brian Russell Strange
David Holop
12100 Wilshire Blvd., Suite 1900
Los Angeles, CA  90025
310-207-5055
lacounsel@earthlink.net

**Finger & Slanina, LLC**
Charles Slanina (DE Bar ID #2011)
David L. Finger (DE Bar ID #2556)
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE  19801
302-573-2525
dfinger@delawgroup.com

## ATTORNEYS FOR APPELLANTS

# I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS.................................................................................ii

II.   TABLE OF AUTHORITIES.......................................................................iv

III.  INTRODUCTION: THE CORRECT CONTEXT FOR DECISION ......................1

   A.    HACKING AS "ROUTINE COMMERCIAL BEHAVIOR" ..............................3

   B.    PLAINTIFFS SUFFICIENTLY PLED ARTICLE III STANDING....................6

IV.   PLAINTIFFS PLAUSIBLY PLEADED FEDERAL STATUTORY CLAIMS ....14

   A.    Plaintiffs Plausibly Pleaded Wiretap Act Claim..................................14

V.    PLAINTIFFS HAVE PLAUSIBLY PLED SCA CLAIM....................................25

   A.    Defendants Were Not Authorized to Access Plaintiffs' Communications..........25

VI.   PLAINTIFFS PLAUSIBLY PLED CFAA CLAIM ................................................32

VII.  PLAINTIFFS PLAUSIBLY PLED CALIFORNIA LAW CLAIMS ....................42

   A.    Plaintiffs Adequately Plead a Claim Under the California Unfair Competition
   Law   42

   B.    Google's Conduct Is Unlawful, Fraudulent and/or Unfair ..................44

   C.    Plaintiffs State Cognizable California Privacy Claims........................46

VIII. CONCLUSION..............................................................................................53

IX.   CERTIFICATION OF BAR MEMBERSHIP .........................................54

X.    CERTIFICATION OF WORD COUNT.................................................55

XI.     CERTIFICATE OF SERVICE UPON COUNSEL ................................................ 56

XII.    CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS ...................... 60

XIII.   CERTIFICATION OF VIRUS CHECK .............................................................. 61

## II.    TABLE OF AUTHORITIES

Cases

*Alston v. Countrywide Financial Corp*., 585 F. 3d 753, 763 (3d Cir. 2009) .................. 7, 9

*Arista Records, LLC v. Doe 3*, 604 F. 3d 110, 120 (2d Cir. 2010).................................... 23

*Arthur v. Maersk, Inc*., 434 F.3d 196, 204 (3d Cir.2006) .................................................. 31

*Bagramian v. Legal Recovery Law Offices, Inc*., 2013 WL 550490, at *5 (C.D. Cal. Feb.

11, 2013)................................................................................................................. 24

*Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010) ................................................................ 24

*Claridge v. RockYou, Inc.,* 785 F. Supp. 2d 855 (N.D. Cal. 2011) ................................... 12

*Craigslist, Inc. v. 3 Taps, Inc*., No. CV 12–03816 CRB, 2013 WL 1819999, at *4 (N.D.

Cal. Apr. 30, 2013).................................................................................................. 33

*Czech v. Wall Street on Demand, Inc*., Civil No. 09–180 (DWF/RLE), 2009 WL

2045308, at *3 (D. Minn. July 10, 2009) ........................................................... 37, 38

*Danvers Motor Co., Inc. v. Ford Motor Co., Inc.*, 432 F. 3d 286, 294 (3d Cir. 2005) ..... 11

*Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1109–13 (N.D. Cal. 2010) ............................ 51

*El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 480, 119 S. Ct. 1430, 1435 (1999)17

*Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938) ................................................... 10, 11

*Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 569 (2005) ..................... 39

*Facebook, Inc. v. Power Ventures, Inc*. (Facebook II), 844 F. Supp. 2d 1025, 1038-39

(N.D. Cal. 2012)...................................................................................................... 34

*Ferrington v. McAfee, Inc.*, No. No. 10-cv-01455-LHK, 2010 WL 3910169, at *19 (N.D. Cal. Oct. 5, 2010) ........................................................................ 51

*Ferrington*, 2010 WL 3910169, at *19 (citing Cal. Rev. & Tax Code §§ 6006, 6010.9). 51

*Fineman v. Sony Network Ent. Int'l LLC*, 2012 WL 424563 at *3, fn. 1 (N.D. Cal. 2012) ............................................................................................................ 12

*Folgelstrom v. Lamps Plus, Inc.*, 125 Cal. Rptr. 3d 260, 264–65 (Ct. App. 2011) ........... 46

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009) .................................. 4

*Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011) .............................. 12, 13

*Freedman v. AOL*, 325 F.Supp.2d 638, 643 (E.D. Va. 2004) .......................................... 29

*Gaos v. Google, Inc.*, 2012 WL 1094646, at *3 (N.D. Cal. 2012) .................................... 9

*Guaranty Trust Co. v. York*, 326 U.S. 99, 105, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945) ... 10

*Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 27 (1994) ................................... 24, 46

*Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013) ......................................... 49

*In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1308 (N.D. Cal. 2008) . 38

*In re DoubleClick*, 154 F. Supp. 2d 497 ..................................................................... 35, 38

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*, No. 12-2358, 2013 WL 5582866 at *4 (D. Del. October 9, 2013) ...................................................... 43

*In re Insurance Brokerage Antitrust Litig.*, 618 F. 3d 300, 319 (3d Cir. 2010) ............... 23

*In re Intuit Privacy Litig.*, 138 F.Supp. 2d at 1277 ....................................................... 30

*In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....... 12, 13, 22, 38

*In re Pharmatrak*, 329 F.3d at 18 ............................................................... 14, 15, 22, 25

*In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 156 (2010) ........................ 49

*In re Toys R Us*, 2001 WL 34517252, at *11 .................................................................. 38

*In re: Application of the United States of America for an Order Authorizing the Use of a*

    *Pen Register and Trap*, 396 F. Supp. 2d 45 (D. Mass. 2005) ........................................ 18

*In re: DoubleClick Privacy Litigation*, 154 F. Supp. 2d 497, 505 (S.D.N.Y. 2001) .......... 2

*In re: Google Inc. Gmail Litig*., 2013 WL 5423918, at *22 (N.D. Cal. 2013) ................ 19

*JBCHoldings NY, LLC v. Pakter*, No. 12 Civ. 7555(PAE), 2013 WL 1149061, at *4-*5

    (S.D.N.Y. Mar. 20, 2013).............................................................................................. 35

*Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1012 (D. Minn. 2012) ..................... 51

*Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1375 ........................................... 49

*Kwikset Corp. v. Sup. Court,* 246 P.3d 877, 885 (Cal. 2011)..................................... 42, 44

*Low v. Linked In Corp.,* 900 F. Supp. 2d 1010, 1021 (N.D. Cal. 2012) .......................... 12

*Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992).......................................................... 11

*LVRC Holdings, Inc. v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) ....................................... 34

*McDonough v. Dannery*, 3 Dall. 188, 198, 1 L. Ed. 563 (1796)...................................... 16

*McKell v. Washington Mut., Inc.* 49 Cal. Rptr. 3d 227, 240 (Cal. Ct. App. 2006) ........... 45

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, n.3 (2010) ............... 39

*Mohamad v. Palestinian Authority, et al.*, 132 S. Ct. 1702, 1710 (2012) ........................ 39

*Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1260 (2009) ................ 51

*Morley Constr. Co. v. Maryland Cas. Co*., 300 U.S. 185, 191, 57 S. Ct. 325 (1937)....... 16

*Mortensen* 2010 WL 5140454, at *7 ................................................................................. 38

*Mount v. PulsePoint, Inc*., 2014 WL 902965 at *1-*2 (S.D.N.Y., Mar. 5, 2014) .............. 3

*Mount v. PulsePoint, Inc*., No. 13-cv-6592 (S.D.N.Y.) ....................................................... 3

*Muscarello v. United States*, 524 U.S. 125, 138–39, 118 S. Ct. 1911 (1998).................. 39

*Navistar Int'l Transp. Corp. v. State Bd. of Equalization*, 8 Cal. 4th 868, 874 (1994)..... 52

*Perrine v. Sega of Am., Inc.*, No. C 13-01962-JSW, 2013 WL 6328489, at *4 (N.D. Cal. Oct. 3, 2013)................................................................................................................ 51

*Pharmatrak*, 329 F. 3d. 9, 18 (1st Cir. 2003) ................................................................... 18

*Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) ................................... 41

*Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) ................................................. 13

*Reno v. Koray*, 515 U.S. 50, 65, 115 S. Ct. 2021 (1995) .................................................. 40

*Rhodes v. Graham*, 37 S.W.2d 46, 47 (Ky. App. 1931)...................................................... 9

*Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F.Supp. 2d 817, 820 (E.D. Mich. 2000)................................................................................................................................ 26

*Singleton v. Wulff*, 428 U.S. 106, 120 (1976).................................................................... 21

*Twombly*, 550 U.S. at 556) ................................................................................................ 23

*U.S. v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010) .............................................. 21

*United States v. American Railway Express Co.*, 265 U.S. 425, 435, 44 S. Ct. 560 (1924) ........................................................................................................................................ 16

*United States v. Balint*, 201 F.3d 928, 935 (7th Cir.2000) ................................................ 40

*United States v. Forrester,* 512 F.3d 500, 510 fn. 6 (9th Cir. 2007) ........................... 18, 48

*United States v. Litchfield*, 986 F.2d 21, 22 (2d Cir. 1993) .............................................. 40

*United States v. Nosal*, 676 F.3d 854, 857 (9th Cir.2012) ................................................ 33

*United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008) ...................................... 48

*United States v. SCRAP*, 412 U.S. 669, 689 n. 14 (1972) ................................................... 9

*Warth v. Seldin*, 422 U.S. 490, 500 (1975) ........................................................ 6, 8

Statutes

18 U.S.C. § 1030(c)(4)(A)(i)(I) ............................................................ 36

18 U.S.C. § 2510(17) ................................................................. 30

18 U.S.C. § 2510(4) ................................................................. 20

18 U.S.C. § 2510(8) ................................................................. 17

18 U.S.C. § 2511 ................................................................... 40

18 U.S.C. § 2511(1) ................................................................ 14

18 U.S.C. § 2511(2) ................................................................ 15

18 U.S.C. § 2520 ................................................................... 14

18 U.S.C. § 2701(a) ............................................................... 28

18 U.S.C. § 2702(b) ............................................................... 28

18 U.S.C. ¶ 2510(d)(2) ........................................................... 22

Cal. Civ. Code § 1761(e) ......................................................... 50

Cal. Civ. Code § 1780(a) ......................................................... 49

California Civil Code § 1770 ...................................................... 49, 50

Rules

Fed. R. Civ. P. 15(a)(1) ............................................................ 31

Fed. R. Civ. P. 15(a)(2) ............................................................ 31

Rule 12(b)(6) ....................................................................... 4

Rule 15(a) ........................................................................ 31

## III.   INTRODUCTION: THE CORRECT CONTEXT FOR DECISION

Defendants-Appellees' answering briefs conjure a reality far removed from the controlling facts in Plaintiffs'-Appellants' Consolidated Amended Complaint ("CAC" or "Complaint").  The following relocates the case's well-pleaded facts.

Accessing a website is an electronic conversation between a user's web browser and an external server, or, more likely, several servers.  To facilitate the conversation – for example, to keep track of passwords, identify visitors, and enable users to move back and forth from web page to web page– websites write small files, called "cookies," to the user's browser.  *See generally* Consolidated Amended Complaint ("CAC") ¶¶ 27-49 (A88-95).

Cookies were originally meant only to facilitate the conversation between the user and the website.  CAC ¶ 39(b) (A91).  However – and here is where the Defendants'-Appellees' spinning of their illicit spying into commonplace commercial activity begins - websites quickly realized the profit potential of "persistent cookies." CAC ¶ 39 (A90-91).  Synchronized with other cookies, persistent cookies enabled the tracking and collection, usually secret, of each web users' internet usage and sensitive personal information.  CAC ¶¶ 40-48 (A91-95).  Third-party ad-serving companies, such as Defendants-Appellees, want and pay websites for this tracked user data.  *Id*. The third party builds digital dossiers on users, including detailed personal information.  That information is then used to

1

send individually tailored "targeted advertising" or "contextual advertising" to users. CAC ¶¶ 46-47 (A93-94).

Double-Click, Inc. ("DoubleClick"), founded in 1995 in New York was one of the first internet ad-serving companies. It quickly became the dominant industry player, and, later, a subsidiary of Defendant Google Inc. ("Google"). DoubleClick's third-party tracking cookies enabled the interception of users' communications with external websites, typically without the users' knowledge. A class action filed in New York on January 31, 2000 alleged that the tracking violated the SCA, the Wiretap Act and the CFAA, along with various state law rights. The Court dismissed the case on the theory of implied consent: "DoubleClick will not collect information from any user who takes simple steps to prevent DoubleClick's tracking . . . [including] configuring their browsers to block any cookies from being deposited." *In re: DoubleClick Privacy Litigation*, 154 F. Supp. 2d 497, 505 (S.D.N.Y. 2001); *see also id.* at 519 (finding that plaintiffs "consent to DoubleClick's interceptions" under the Wiretap Act). *DoubleClick* turned largely on the notion that a user implicitly consents to tracking by not enabling the browser's *easily activated* cookie blocking mechanism.

Plaintiffs' case differs greatly from *DoubleClick*. Plaintiffs here, unlike the plaintiffs in *DoubleClick*, used browsers set to block tracking cookies. CAC ¶ 69 (A101). But starting in 2011 (or possibly as early as 2009), five unrelated online

ad-serving companies, including the four Defendants-Appellees[1], developed a multi-step method to secretly hack past the already set, default cookie blocking settings on the Safari and Internet Explorer browsers of many users. Covert tracking followed.

In early January 2012 the *Wall Street Journal* broke the "Safari-gate" story. The hacking immediately stopped. The hacking had not been implicitly or explicitly consensual, as its technical complexity and secrecy show. The Plaintiffs and other users were unaware that the Defendant-Appellees had secretly disabled their privacy protecting cookie-blocking settings.

## A.    HACKING AS "ROUTINE COMMERCIAL BEHAVIOR"

The Defendants' Response Briefs are full of challenges to facts asserted in the Plaintiffs' Complaint and replete with new facts not in the record. For example, Defendant Google makes the intensely factual argument that the tracking was an innocent mistake, asserting the "Google team" that designed a tracking

---

[1] An action against the fifth company, PulsePoint, Inc., is proceeding separately in the Southern District of New York, *see Mount v. PulsePoint, Inc.*, No. 13-cv-6592 (S.D.N.Y.) and was assigned to Judge Buchwald, the author of *DoubleClick*. Judge Buchwald has stayed *PulsePoint* pending this Court's ruling, finding important questions under the three federal statutes at issue in both cases "overlap extensively" and that this Court's ruling will offer "valuable guidance." These questions include whether the injuries alleged suffice for Art. III standing and whether uniform resource locators ("URLs") can be "content" under the Wiretap Act. *Mount v. PulsePoint, Inc.*, 2014 WL 902965 at *1-*2 (S.D.N.Y., Mar. 5, 2014).

cookie was unaware of a particular design feature in Apple's Safari browser. *See* Answering Brief of Defendant-Appellee Google Inc. ("Google Brief"), p. 10. This and Defendants' other factual challenges, and Defendant's new facts, cannot support a Rule 12(b)(6) dismissal. Plaintiffs' well-pleaded facts, and their attendant reasonable inferences, control. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009) (on motion to dismiss "courts . . . must accept all of the complaint's well-pleaded facts as true"). One new "fact" on which all Defendants' arguments depend must, however, be addressed here.

Both Answering Briefs argue that Defendants' surreptitious dismantling of cookie-blocking settings was routine, non-controversial business activity. Google calls its tracking cookies a "standard feature of the modern Internet." Google Brief, p. 1. Similarly relying on entirely factual argument, the other Defendants describe their secret hacking as "routine commercial behavior." *See* Answering Brief of Defendants-Appellees Media Innovation Group, LLC, WPP plc, and Vibrant Media Inc. ("MIG-Vibrant Media Brief"), p. 1.

Apart from being fact arguments unavailable to support dismissal, Defendants re-write the factual question to let them supply a factual and innocuous answer. Plaintiffs are not challenging <u>consensual</u> use of tracking cookies. Plaintiffs allege, with well-pleaded facts that must be taken as true at this stage, that the Defendants' tracking was <u>nonconsensual</u>. Contrary to industry practice

4

and contrary to their own privacy policies, Defendants secretly disabled the default privacy protections of millions of Safari browsers, allowing the illegal interception of billions of electronic communications.

For Defendants, as the CAC demonstrates, hacking was "routine commercial behavior" at least until the defendants were caught. *See, e.g*., CAC ¶ 110 (A112). "Routine" here is inculpatory, not exculpatory. After investigating this "routine" behavior, on August 8, 2012, the Federal Trade Commission filed a complaint against Defendant Google for misrepresenting the company's privacy policies and the extent to which consumers may exercise control of their personal data. CAC ¶ 166 (A124). The FTC charged Google with "deceptive conduct." Worse, the FTC charged that Google violated an earlier FTC consent decree. Google paid a fine of $22.5 million – a record for a violation of a Commission order. *Id*., ¶ 170 (A127).

Subsequently thirty-six states and the District of Columbia jointly pursued Google for the same supposedly "routine commercial behavior." Settling, Google executed a joint "Assurance of Voluntary Compliance," announced on November 18, 2013. *See* Request for Judicial Notice ("RJN"), Exhibit A. Google agreed to pay another $17 million and undertook numerous remedial measures. This was the largest joint privacy settlement with the states in U.S. history. Nine of the State

Attorneys General made statements about Google's actions.  Connecticut Attorney General George Jepson's statement provides a representative example:

> *Google represented that consumers could avoid third-party cookies being placed in their Safari Web browsers simply by relying on the browser's default settings.  This settlement resolves allegations that, while giving these very assurances, Google was actually bypassing those same privacy settings and placing advertisers' cookies on consumers' Safari browsers, without their knowledge or consent.*

*See* RJN, Ex. B.  *See also* Ohio Attorney General's statement, RJN, Ex. H ("Consumers' default privacy settings were circumvented without their knowledge.");  New Jersey Attorney General's statement, RJN, Ex. F ("Consumers have every right to surf the Web without fear that businesses are bypassing their privacy settings through technical tricks.")..

### B.    PLAINTIFFS SUFFICIENTLY PLED ARTICLE III STANDING

### 1.  Plaintiffs Properly Alleged Statutory Standing

Settled law holds that Article III standing can arise from an allegation of an invasion of a statutorily created protection to which the plaintiff is entitled. For statutory standing, the invasion of the right Congress wanted protected is the injury in fact.  No additional harm, tangible or intangible, monetary or non-monetary, is necessary.  *See Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Alston v. Countrywide*

*Financial Corp*., 585 F. 3d 753, 763 (3d Cir. 2009) (alleged deprivation of statutory right to conflict-of-interest free real estate closing was injury in fact even though plaintiff suffered no financial injury).

For statutory standing, determining injury-in-fact is fundamentally a matter of statutory interpretation, not a free-form search for and weighing of some unidentified extra-statutory injury. *See Alston*, 585 F. 3d at 759 ("The overriding question before us is whether Congress intended to create a private right of action for a consumer who alleges a violation of RESPA section 8 in connection with his or her settlement, even if that violation does not result in a traditional monetary injury…Countrywide does not seriously dispute that, if we answer that question in the affirmative, plaintiffs…will have alleged an injury-in-fact sufficient for purposes of Article III standing.  We thus turn to the parties' statutory interpretation arguments….")

Defendants[3] essentially ignore this statutory standing rule. Defendants point to no language in the Wiretap Act, Stored Communications Act ("SCA") and Computer Fraud and Abuse Act ("CFAA") excluding Plaintiffs from the privacy protections of these statutes.  Whether Plaintiffs sufficiently alleged an

---

[3]  Only Defendant Google raises a standing defense.  Although Defendants MIG and Vibrant Media incorporated Google's defenses by reference in the trial court, see MIG-Vibrant Media Brief at p. 7, fn. 4, they apparently did not do so in this Court.

"interception" for Wiretap Act liability, or a "service provider" for SCA purposes, or an "access violation" under the CFAA are merits issues, not standing requirements.

Defendants also ignore the equally settled rule that "standing in no way depends on the merits." *Warth*, 422 U.S. at 500. Defendants essentially and erroneously claim the court must do merits analysis on each element of each claim to find standing. Indeed, Google concedes that "injury required by Art. III may exist solely by virtue of statutes creating legal rights," Google Brief at p. 25, but then dedicates three pages of the brief to arguing the merits of whether the CAC alleged sufficient facts to assert the statutory claims. In fact, Google raised and lost this same argument two years ago:

> Google argues that [plaintiff] has failed to allege any injury resulting from the SCA violation. Google, however, has not cited any authority supporting its argument that injury beyond a violation of the SCA itself is required to allege a concrete injury. The court finds that the SCA creates a right to be free from the unlawful disclosure of communications as prohibited by the statute. The SCA explicitly creates a private right of action for persons aggrieved by a disclosure of their communications in violation of the statute. 18 U.S.C. § 2702(a) (providing that "any ... person aggrieved by any violation of this chapter" may maintain a civil action if the violation was done knowingly or intentionally). Google's argument fails because the SCA provides a right to judicial relief based only on a violation of the statute without additional injury. Thus, a violation of one's statutory rights under the SCA is a concrete injury. *See Jewel v. National Sec. Agency*, 2011 WL 6848406, at *4 (9th Cir.2011) (finding violation of the SCA to be a concrete injury).

*Gaos v. Google, Inc*., 2012 WL 1094646, at *3 (N.D. Cal. 2012). Plaintiffs

sufficiently alleged Art. III standing for their statutory claims.

### 2.   Plaintiffs Sufficiently Alleged Injury For Common Law Claims

Article III standing requires allegations of concrete injuries.  Statutory

standing itself shows that injuries-in-fact satisfying Art. III need not be, and need

not include, out-of-pocket monetary damages.  *See, e.g., Alston*, 585 F. 3d at 763

("Certainly, the fact that plaintiff's injury is non-monetary is not dispositive.").  If

state law recognizes a privacy tort or provides any other private right of action for

misappropriation of personally identifiable information ("PII"), a detailed

allegation of the concrete facts constituting the *prima facie* elements of that injury

more than satisfies the "identifiable trifle" test of injury in fact for Art. III.  *See*

*United States v. SCRAP*, 412 U.S. 669, 689 n. 14 (1972).  Defendants offer no

reason why a state <u>statute</u>, but not state <u>common law</u>, can confer a right the

violation of which creates standing. Defendants' unsupported distinction raises

thorny Constitutional problems.

For example, Kentucky recognizes a tort for invasion of privacy, "and the

injured person is entitled to recover damages."  *Rhodes v. Graham*, 37 S.W.2d 46,

47 (Ky. App. 1931). (*See* Plaintiffs-Appellants' Opening Brief, p. 22). Kentucky's

law does not require the victim suffer any out-of-pocket loss.  Intrusion into the victim's legally protected privacy interest suffices. *See id*. ("The fact that the damages cannot be measured by a pecuniary standard is not a bar to his recovery.").  If this Kentucky law claim were included in a federal case, the Defendants' position – that because the privacy invasion did not cause any out-of-pocket damages, the federal court lacks jurisdiction –would extinguish a right conferred by state substantive law.  Such a result is impermissible under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938) (federal courts to apply the laws of the states when sitting diversity).  The result is the same for state law equitable claims, such as unjust enrichment, that do not require the plaintiff to have sustained out-of-pocket damages.  *See, e.g., Guaranty Trust Co. v. York*, 326 U.S. 99, 105, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945) ("In giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law or to create substantive rights denied by State law").  Congress is free to limit the jurisdiction of federal courts and could, in theory, confine diversity cases to those seeking out-of-pocket losses.  But Congress did not, and allegations that a defendant violated a legal or equitable right under state common law is sufficient to establish "concrete injury" within the bounds of Art. III.

### 3.    No Out-of-Pocket Damages Requirement for Standing

"General allegations of harm" suffice for standing at the pleading stage. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'")*.* As then Judge Alito wrote for this Court: "Injury in fact is not Mt. Everest." *Danvers Motor Co., Inc. v. Ford Motor Co., Inc.*, 432 F. 3d 286, 294 (3d Cir. 2005) ("The contours of the injury in fact requirement, while not precisely defined, are very generous, requiring only that the claimant allege[ ] some specific, 'identifiable trifle' of injury." (internal citation omitted). Plaintiffs here allege injury in fact more specifically than the general allegations that would suffice. Plaintiffs allege Defendants secretly disabled the plaintiffs' privacy protections (thus impairing their browsers) and misappropriated their personally identifiable information ("PII") (which have monetary value and which the Defendants in fact unjustly profited from) in violation of federal statutes, and state statutory and common law. Plaintiffs thus have alleged concrete injury.

The correct view of standing must hew to *Erie's* mandate of respect for state substantive law and to these Art. III principles. The correct view is that, just like Defendant's invasion of Plaintiffs protected statutory rights to be free from secret cyberspace spying, the Defendant's misappropriation of a Plaintiff's economically

valuable PII suffices for injury in fact.  *See, e.g., Claridge v. RockYou, Inc.,* 785 F. Supp. 2d 855 (N.D. Cal. 2011)*; Low v. Linked In Corp.,* 900 F. Supp. 2d 1010, 1021 (N.D. Cal. 2012) ("Because Plaintiffs have alleged that *their* information has been disclosed to third parties by LinkedIn's policies, Plaintiffs have sufficiently articulated, with particularity, injury as to themselves for the purposes of Art. III standing." (emphasis in original)); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012); *Fraley v. Facebook, Inc*., 830 F. Supp. 2d 785 (N.D. Cal. 2011) (Facebook "Sponsored Stories" litigation; plaintiffs sufficiently alleged concrete injury in that stolen PII had value to the victims – they could have monetized the misappropriated data if they chose even though no out-of-pocket losses alleged);  *Fineman v. Sony Network Ent. Int'l LLC*, 2012 WL 424563 at *3, fn. 1 (N.D. Cal. 2012) (*Fraley* court found that plaintiffs "had adequately alleged a right to be paid for their endorsements . . . . That right was concrete and particularized.").

Far outside established Art. III law, however, the trial court below found that Plaintiffs were Constitutionally required to demonstrate their ability to monetize their PII was *diminished* by the hackers' theft, even if not required by any state cause of action in this case. A24-25.  Under this view, even if Defendants stole the PII by trespass or other illegal means, even if the PII has economic value to Defendants who profit from the PII, and even if the Plaintiffs could have

monetized their PII, the Plaintiffs have no Constitutional ability to pursue an otherwise viable state law claim, including an unjust enrichment claim.

Plaintiffs alleged injury in fact under even the narrowest view of PII's application to injury in fact. Just like the *iPhone* plaintiffs, Plaintiffs here sufficiently alleged the ability to monetize the type of data stolen. Just like in *Fraley*, it should not matter that the Plaintiffs might still be able to sell the same PII the Defendants took. The PII did not belong to the Defendants. The Constitution does not require the abrogation of state law rights simply because they are asserted in Federal Court.[4]

---

[4] Defendants cite to no circuit court that has required a showing of monetary harm when faced with state common law privacy claims. Every appellate decision Defendants cite addresses the completely distinguishable threat of future harm. For example, in *Reilly v. Ceridian Corp.*, this Court found Article III harm lacking, but not because the theft of PII wasn't injury. Instead, the Court said that the threat of future harm is not concrete injury. *Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011). Here, *Reilly's* premise is inapplicable. Plaintiffs' claims arise from completed theft and misuse of data.

## IV.    PLAINTIFFS PLAUSIBLY PLEADED FEDERAL STATUTORY CLAIMS

### A.    Plaintiffs Plausibly Pleaded Wiretap Act Claim

The Wiretap Act provides a private right of action against one who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication." *See* 18 U.S.C. § 2511(1) (listing prohibited conduct); 18 U.S.C. § 2520 (providing private right of action).  The Defendants are liable if they:

    a.     Intentionally
    b.     Intercepts (or endeavored to intercept, or procured another to do so)
    c.     The contents of
    d.     An electronic communication
    e.     Using a device.

*In re Pharmatrak*, 329 F.3d at 18.   All parties agree that the CAC alleged "intentional" behavior.  All parties agree that the CAC alleged an "electronic communication."  A third element, whether the intercepted URLs can contain "content," is contested.

In their answering briefs, Defendants raise, for the first time in this Court, the remaining two Wiretap Act elements: whether communications were alleged to have been "intercepted" and whether the Defendants employed a "device." Neither issue is properly before this Court.  Neither was identified as an issue in the

Plaintiffs-Appellants' Notice of Appeal, and neither was addressed in Plaintiffs' opening brief. Defendants did not cross-appeal on these issues. Never even raised in the trial court, the "device" element is waived for this reason as well.

The Wiretap Act provides a statutory exception for authorized parties to the communication. 18 U.S.C. § 2511(2). The federal Wiretap Act is a "one party consent" statute, unlike many state laws (including California's CIPA, discussed below) that require the consent of all parties. An exception to the exception, however, the "crime/tort exception," provides that the liability immunity for parties to communications disappears if the party intercepts communications for criminal or tortious purpose. *Id*. The "party consent" statutory exception is an affirmative defense. The Defendants have the burden of showing consent. *In re: Pharmatrak*, 329 F.3d at 19 ("We think, at least for the consent exception under the ECPA in civil cases, . . . it makes more sense to place the burden of showing consent on the party seeking the benefit of the exception, and so hold.").

Ignoring the many, powerful, and unavoidable contrary implications from their secret cyberspace piracy, Defendants counterfactually argue that Plaintiffs "voluntarily" communicated with them, making Defendants statutorily permitted parties to the intercepted communications. This sophistry is (a) a factual argument that (b) directly contradicts the Plaintiffs' well-pleaded facts and the inferences

15

from those facts and (c) assumes the Court has exactly zero common sense. As the

trial court stated:

> as defendants bypassed the browser settings to place cookies that
> would allow them to later associate plaintiffs' data, the court declines
> to characterize defendants as within the statutory 'party' exception.
> Moreover, viewing the facts in the light most favorable to plaintiffs,
> plaintiffs' browsers sent different information in response to targeted
> advertising than would have been sent without the setting of third-
> party cookies. For this reason also, Google is not appropriately
> deemed a party to the communications.

A27. Defendants argue that finding should be reversed. But, as with the

"intercept" and "device" issues, the Plaintiffs'-Appellants' Notice of Appeal did

not identify the "consent party" exception as an appellate issue. Defendants never

filed a cross-appeal on this issue.

### 1.    Defendants' Failure to File a Cross-Appeal Bars Their Arguments About "Interception," "Devices" and "Consent Party Exception"

Without filing a cross-appeal, an appellee may not attack portions of the

lower-court decision not on appeal if the attack has a view to enlarging the

appellee's rights or lessening the rights of his adversary. *McDonough v. Dannery*,

3 Dall. 188, 198, 1 L. Ed. 563 (1796); *accord, United States v. American Railway

Express Co.*, 265 U.S. 425, 435, 44 S. Ct. 560 (1924). The rule is "inveterate and

certain," *Morley Constr. Co. v. Maryland Cas. Co.*, 300 U.S. 185, 191, 57 S. Ct.

325 (1937), a *de facto* jurisdictional bar with no exceptions: "even if it is not

strictly jurisdictional (a point we do not resolve) . . . in more than two centuries of repeatedly endorsing the cross-appeal requirement, not a single one of our holdings has ever recognized an exception to the rule." *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 480, 119 S. Ct. 1430, 1435 (1999).

Defendants are free to attack the reasoning of the court with respect to the URL issue. Defendants can raise alternative arguments based on facts in the thin pleadings stage record. But Defendants cannot appeal new issues – the "device," "interception" and "party consent" exception – even if their resolution could be alternative bases for the trial court's decision. *See, e.g., Neztsosie*, 526 U.S. at 479-480 (Ninth Circuit decided to dispose of all "related" alternative bases for trial court's decision "at one blow" even though one basis was not technically on appeal; Supreme Court reversed).

The only Wiretap Act element properly on appeal is whether URLs can contain "contents," the interception of which violates the Wiretap Act.

### 2.    URLs Contain "Contents" For Wiretap Act

"Contents" are broadly defined under the Wiretap Act. "Contents" include "any information concerning the substance, purport or meaning" of "any" "electronic communication." 18 U.S.C. § 2510(8). "Contents," then, include, but

are not limited to, "the substance, purport or meaning" of a communication. URLs

can contain "information concerning" such "substance, purport or meaning."

Plaintiffs allege that entire URLs – not just simple IP addresses – are

intercepted, including any associated values and search terms that reflect the

substance of human thought, sometimes the most intimate of such thoughts. No

court, other than the trial court here and the Court of Appeals for the Armed Forces

("C.A.A.F."), has ever held that the Wiretap Act permits the nonconsensual

interception of internet communications. As Appellants' opening brief states, the

C.A.A.F. did not fully develop the precise issue of whether URLs contain content.

Other courts, analyzing the issue more carefully, have ruled that URLs can contain

content. *See, e.g., United States v. Forrester,* 512 F.3d 500, 510 fn. 6 (9th Cir.

2007) ("A URL, unlike an IP address, identifies the particular document within a

website that a person views and thus reveals much more information about the

person's Internet activity."); *In re: Pharmatrak*, 329 F. 3d. 9, 18 (1st Cir. 2003)

("Pharmatrak has not contested whether it . . . obtained the contents of an

electronic communication. **This is appropriate**." (emphasis added)); *Undated*

*Opinion of the Foreign Intelligence Surveillance Court* A213-228 (URLs can

contain contents); *In re: Application of the United States of America for an Order*

*Authorizing the Use of a Pen Register and Trap*, 396 F. Supp. 2d 45 (D. Mass.

2005) (same).

Defendants make two arguments in opposition.  First, they cite cases holding that internet users have no reasonable expectation of privacy in their URLs in the Constitutional sense, removing any Fourth Amendment prohibition against warrantless surveillance of internet activity.  But the Wiretap Act provides statutory protections beyond the minimums guaranteed by the Constitution.  The Wiretap Act nowhere limits its protections to mere "expectations of privacy." "Content" within the Wiretap Act's protection is not co-extensive with expectations of privacy. Defendant Google is well aware of this distinction.  In the Gmail scanning litigation in California, Google successfully argued that Gmail users have no "reasonable expectation of privacy" in emails.  The court agreed, and dismissed a state eavesdropping claim. *See In re: Google Inc. Gmail Litig.*, 2013 WL 5423918, at *22 (N.D. Cal. 2013).  However, the court allowed a federal Wiretap Act claim to proceed.  *Id*. at *24.

Second, Google argues that the recently declassified opinion of the FISC, finding that URLs can contain content, should be disregarded because substantial portions of the opinion were redacted for national security reasons. But the relevant holding is clear.  The National Security Agency may not engage in warrantless bulk surveillance of the internet because URLs can contain content within the meaning of the Wiretap Act.  Full stop.

The import of a different ruling here would mean, illogically, that Defendants have greater rights than the NSA to do non-consensual mass surveillance of internet communications. If Defendants were to succeed with this argument, would they support the NSA's inevitable petition to reverse the FISC's earlier decision to let the NSA recover the "free to do internet surveillance" right Defendants claim to enjoy?

### 3.    The Defendants "intercepted" the URLs

Defendants MIG and Vibrant Media (not Google) argue that they did not "intercept" any communications. *See* MIG and Vibrant Media Brief at p. 11. But they admit to having received the communications. The Wiretap Act defines "interception" as the "acquisition of the contents" of any electronic communications. 18 U.S.C. § 2510(4). Defendants MIG and Vibrant essentially argue that they cannot "intercept" a communication to which they were a party despite having "acquired" the communication through interception the Act prohibits. This is a back-door attempt to invoke the party exception that the trial court correctly rejected, and improperly raises a factual affirmative defense.

### 4.    Defendants Used a Wiretap Act "Device"

The Wiretap Act requires that the intercept occur through a "device." For electronic communications a "device" means a person's computer or computer

code or even tracking cookies. *See, e.g., U.S. v. Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010). (defendant obtained access to supervisor's work computer and caused emails to be duplicated and sent to defendant who was prosecuted under the Wiretap Act for illegally intercepting electronic communications; court found at least three separate computers could satisfy "device" requirement: supervisor's computer; the company server through which email duplication and delivery occurred; defendant's computer where intercepted communications were ultimately received and read).

Plaintiffs' pleaded numerous computers qualifying as the requisite "device." These include the Plaintiffs' computers where the Defendants disabled the tracking-cookie protection and installed cookies; or various intermediate servers; or the servers owned by Defendants where the intercepted communications eventually landed. Likewise, computer code or tracking cookies can be "devices." The Plaintiffs specifically allege this. A139**.**

Defendant Google conceded the "device" element in the trial court *See* Response Brief of Defendant Google dated March 29, 2013, at p. 14, fn. 4. Because Google did not challenge this element in the trial court, Google has waived it for this appeal. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). This issue is also not properly before this Court because

no Defendant cross-appealed on it.  Nor could they have.  Defendants had failed to challenge the issue in the trial court.

Google now argues, without any reasoning, that Plaintiffs' allegation regarding the device "fails to state a claim." The CAC alleged that Google used "devices" (*i.e.*, computers and computer code) to install its cookies, *see* CAC ¶ 203 A138-39, and that the cookies themselves are "devices."  Plaintiffs alleged that the computers, the code and the cookies were "devices" used to intercept contents.

### 5.  Defendants are not authorized "parties" to the communications

#### a.    *The Defendants cannot invoke the statutory exception because they were not "authorized"*

The Wiretap Act provides an affirmative defense to any person who is an authorized party to the communication.  18 U.S.C. 2510(d)(2).  This makes the Wiretap Act a "one party consent" statute.  It is an affirmative defense the Defendants bear the burden of establishing. *In re: Pharmatrak*, 329 F.3d at 19.

Correctly finding that Defendants cannot manufacture a liability exception by secretly violating the statute containing the exception, the trial court rejected the party consent defense here.  *See, e.g., In re: iPhone Application Litig*., 844 F. Supp. 2d 1040, 1062 (N.D. Cal. 2012) (Wiretap Act defendant "cannot manufacture a statutory exception through its own accused conduct"). Defendants failed to cross-appeal this finding.  They cannot challenge it now.  Plaintiffs' well-pleaded allegations show Plaintiffs' communication with Defendants was

involuntary, unwitting, and resulted only from Defendant's illegal trickery. At

minimum Plaintiffs' allegations contain "'enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal[ity]'" of the challenged

conduct. *See In re Insurance Brokerage Antitrust Litig.*, 618 F. 3d 300, 319 (3d

Cir. 2010) (quoting *Arista Records, LLC v. Doe 3*, 604 F. 3d 110, 120 (2d Cir.

2010), in turn quoting *Twombly*, 550 U.S. at 556)), *id.,* n. 17 (describing "[o]ne of

*Twombly's* formulations of the plausibility pleading standard"). Even were some

communications were "voluntary," the Defendants' illegal installation of tracking

cookies enabled the gathering of far greater content than any consent

contemplated. *See In re: Pharmatrak*, 329 F.3d at 19 ("A party may consent to the

interception of only part of a communication or to the interception of only a subset

of its communications . . . . Thus a court must inquire into the *dimensions of the*

*consent* and then ascertain whether the interception exceeded those boundaries."

(emphasis in original) (internal citations omitted)). Finally, to the extent the scope

of consent here is relevant, Plaintiffs pleaded sufficient facts "to raise the

reasonable expectation that discovery will reveal evidence" (*Twombly*, 550 U.S. at

556) that Plaintiffs did not consent, or that any theoretical "constructive consent" –

no record facts show it - did not extend to Defendants' tracking.

### *b.*     *Exception to the Exception*

Even if the Defendants were "parties" to the intercepted communications, they are outside of the statutory exception because their purpose in intercepting the communications was alleged to be tortious. *See Caro v. Weintraub*, 618 F.3d 94 (2d Cir. 2010). California recognizes at least two invasion of privacy torts, *see, e.g., Bagramian v. Legal Recovery Law Offices, Inc*., 2013 WL 550490, at *5 (C.D. Cal. Feb. 11, 2013). The CAC clearly and repeatedly alleges that the defendants' hacking the Safari browser and intercepting the plaintiffs' internet communications was done with tortious intent. A138; *see also generally Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 27 (1994) (intentional violation of California's Constitutional right to privacy can be asserted against non-governmental actors for money damages). The CAC alleges Defendants intercepted the communications with tortious intent, which renders the "party consent" exception inapplicable.

## V.    PLAINTIFFS HAVE PLAUSIBLY PLED SCA CLAIM

### A.    Defendants Were Not Authorized to Access Plaintiffs' Communications

Defendants' Stored Communications Act ("SCA") defense reprises the same "party to the communication" hypothetical on which they seek to escape Wiretap Act liability, claiming the communications they grabbed were *of* or *intended for* the Defendants. This defense fails for the SCA claim for the same reason it fails for every other claim. Consent or authorization "should not be casually inferred" in ECPA claims. *In re: Pharmatrak*, 329 F.3d 9, 20 (1st Cir. 2003). Just as a medical patient may consent to one form of treatment, but refuse another, so too may a party consent to access to "only a subset of its communications." *Id*. at 19. In ECPA claims, courts must "inquire into the dimensions of the consent and then ascertain whether (the behavior at issue) exceeded those boundaries." *Id*.

As the Complaint demonstrates, Defendants' hacking past the cookie and tracking blocking settings on Plaintiffs' browsers necessarily involved intentional circumvention of security controls. Defendants' contend they were authorized to access Plaintiffs' devices and communications because Defendants employed computer wizards slick enough to surreptitiously circumvent the Plaintiffs' browsers' privacy settings. Such rationalization eviscerates the SCA's purpose –

"to create a cause of action against computer hackers." *Sherman & Co. v. Salton Maxim Housewares, Inc.*, 94 F.Supp. 2d 817, 820 (E.D. Mich. 2000).

### 1. Web-Browsers Provide a Service

This Court must reject Defendants' claim that web-browser companies cannot be ECS providers because, according to Defendants, "[i]n ordinary English usage, one would not refer to a web-browser as a 'service' or a 'provider' of a service." *WPP Brief* at 26. "Ordinary English usage" would not call text files in browser directories "cookies," either, showing this issue is at worst for Plaintiffs a factual issue. And, coming from the Defendants, all leading Internet technology companies, this argument is absurd. Defendant Google includes a "Terms of Service" agreement governing the use of its own web-browser, Google Chrome.[5] Additionally, Apple and Microsoft have similar license agreements for users of their web-browser services rendering the argument that they are not a provider of a service untenable.[6] Absent the service provided by web-browsers, Plaintiffs would not have the ability to send or receive wire or electronic communications on the Internet.

### 2. Apple and Microsoft are Entities

---

[5] See https://www.google.com/intl/en_US/chrome/browser/privacy/eula_text.html
[6] https://www.apple.com/legal/sla/docs/SafariWindows.pdf
http://windows.microsoft.com/en-us/internet-explorer/products/ie-9/end-user-license-agreement

Defendants' disingenuously attempt to disconnect the web-browser software from the entities (Apple and Microsoft) that created them and allow consumers such as the plaintiffs to use them to communicate on the Internet. Specifically, Defendants' claim web-browsers cannot qualify as ECS providers because the SCA "repeatedly refers to providers of ECSs as "persons or entities.'" *WPP Brief* at 26. Defendants' mischaracterize Plaintiffs' factual allegations. Plaintiffs' have alleged that "Apple Safari and Microsoft Internet Explorer both provide electronic communication service because they "provide to users thereof the ability to send or receive wire communications." *CAC* at ¶216. Both Microsoft and Apple are entities.  As the CAC alleges, neither Microsoft nor Apple consented to Google's unauthorized access to the Plaintiffs' web-browsers.

### 3.  Browser-Managed Files and Personal Computing Devices are "Facilities"

Defendants argue that browser-managed files and personal computing devices cannot be "facilities" under the SCA because such a construction would make the statute illogical. *Google Brief* at 40. As part of that argument, Google asks this Court to conflate the definition of an electronic communication service provider with that of a "facility," arguing that because a computing device does not "provide an electronic communication service," it cannot be a "facility." *Google Brief* at 38. A plain reading of the statute, however, reveals that ECS provider and "facility" are distinct concepts. See *Plaintiff's Appellate Brief* at 35.

Nor have Plaintiffs pled that their computing devices are ECS providers. Plaintiffs alleged that Apple Safari and Microsoft Internet Explorer are the relevant ECS providers and that the plaintiffs' computing devices and the browser-managed files on their computing devices are facilities through which Apple Safari and Microsoft IE's services are provided. CAC at ¶216-218.

Google also claims an ECS provider could never grant access to a user's home computer. Google does not mention that, if an ECS provider did so without consent or an exception covered in other parts of the SCA, it would be subject to liability of its own under the SCA. *See* 18 U.S.C. § 2702(b) and 2703(c) for a list of such exceptions. Plaintiffs' have alleged that both their home computers and the browser-managed files on their home computers are "facilities" "through which an electronic communication service is provided." *See* 18 U.S.C. § 2701(a) and *CAC* at ¶216-218.

Defendants, all companies that profit from third party cookies, cannot plausibly claim that web browsers cannot consent to a third-party's access to a plaintiff's personal computing device or browser-managed files. That web browsers can consent to such conduct is the entire basis of the Defendants' business model. In this case, however, neither Apple nor Microsoft, which provided the web-browsers, nor the end-user plaintiffs consented to the

Defendants' access to either their personal computing devices or the browser-managed files in their web-browser software.   *CAC* at ¶216-218

### 4. ECS Providers May Access the Facilities at Issue in This Case, But Only Under One of the Exceptions Set Forth in the SCA

Defendants' claim that "[f]or an ECS provider like an ISP to have a statutory right to authorize third-party access to its users Personal Devices under any circumstances – including those contained in Section 2702(b) – would be "absurd and bizarre[.]" *WPP Brief* at 31. This statement directly contradicts both the SCA's clear language and interpretative cases. The SCA prohibits disclosures of subscriber information and the contents of subscriber communications by electronic communications service providers "unless the disclosure comes within one of the six exceptions set forth in § 2702(c)." *Freedman v. AOL*, 325 F.Supp.2d 638, 643 (E.D. Va. 2004).

Google's own actions illustrate the falsity of Defendants' argument. Google's Terms of Service for its Chrome web-browser explicitly inform Chrome users that, "From time to time, Google Chrome may check with remote servers (hosted by Google *or by third parties*) for available updates to extensions, including but not limited to bug fixes or enhanced functionality. You agree that such updates will be automatically requested, downloaded, and installed without further notice to you."[7]

---

[7] https://www.google.com/intl/en_US/chrome/browser/privacy/eula_text.html at ¶20.2.

The browser which Google and its third-party helpers access is located on the computing devices of Google Chrome users – and because of the clear Terms of Service, such third-party access is legal because it has the consent of Chrome users.

### 5.  Plaintiffs Pled Electronic Storage

The SCA defines "electronic storage" as including "(A) any temporary, intermediate, storage of a[n] … electronic communication incidental to the electronic transmission thereof …" 18 U.S.C. § 2510(17). The SCA simply requires Plaintiffs to plead facts suggesting that data the Defendants accessed without authorization was temporarily stored pending delivery to an intended recipient. Plaintiffs pled precisely that. See CAC ¶ 218. Plaintiffs allege extensive facts explaining how the Defendants carried this out and how, specifically, the information was stored. See CAC ¶¶27-58, 68-78, 147-152. The browser-managed files storing the cookies, the "facilities" Plaintiffs alleged were accessed without authorization (CAC ¶ 217), are within the SCA's "electronic storage definition. See *In re Intuit Privacy Litig.*, 138 F.Supp. 2d at 1277 ("Plaintiffs have alleged that Defendant accessed data contained in 'cookies' that it placed in Plaintiffs' computers' electronic storage. The court concludes that this allegation satisfies the liberal requirements of Rule 8(a)(2).")

### 6.  Plaintiffs Did Not Waive Their Right to Amend the Complaint

Defendant Google cites to Fed. R. Civ. P. 15(a)(1), saying Plaintiffs had twenty-one (21) days after the filing of a 12(b) motion to amend the Complaint. Google Answering Brief at 69, n. 20.  This statement ignores the remaining subsections of Rule 15(a).  Rule 15(a)(2) states that: "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also Arthur v. Maersk, Inc*., 434 F.3d 196, 204 (3d Cir.2006) ("Leave to amend must generally be granted unless equitable considerations render it otherwise unjust."). Plaintiffs have not waived their right to amend.  Should it be necessary, Plaintiffs will timely file a Motion with the court to amend the pleading in accordance with Fed. R. Civ. P. 15(a)(1) and D. Del. LR 15.1.

## VI.   PLAINTIFFS PLAUSIBLY PLED CFAA CLAIM

### 1.    Authorization

Both Answering briefs argue no CFAA violation exists here because access to the Plaintiffs' computers was *authorized*.  That argument ignores many well-pleaded facts and their compelling liability inferences.  Defendants hacked the plaintiffs' cookie-blocking protections, secretly, for profit.  When they got caught, they stopped, offering none of the argument that they make here, as in "Oh, you authorized it!"   *See, e.g*., Google Brief at 49 (hacking Safari to secretly place tracking cookies is "normal function"); at 50 ("Google only interacted with those browsers in ways they were designed"). This argument is about like a thief defending his break in by saying "I used the back window the way it was designed." The MIG/Vibrant Media Brief even argues that granting limited access to a computer for one purpose supposedly grants authorization for all purposes. MIG/Vibrant Media Brief at 57. No law says that. The CAC's controlling facts do not say that.  Any facts supporting such a claim are not in the record and are for discovery and trial.

First, Defendants clearly violated the CFAA's access restrictions. 18 U.S.C. § 1030(a)(2). "Access restrictions" include "who may access information, what information may be accessed, [and] the methods by which information may be accessed." *Craigslist, Inc. v. 3 Taps, Inc*., No. CV 12–03816 CRB, 2013 WL

1819999, at *4 (N.D. Cal. Apr. 30, 2013) (citing *United States v. Nosal*, 676 F.3d 854, 857 (9th Cir.2012) (en banc), as holding these elements are "more properly considered 'access' restrictions under the CFAA").  Defendants had no express authorization to circumvent Plaintiffs' default browser setting using their hidden ad-embedded codes (see CAC ¶¶ 153, 154), triggering invisible iframes and forms (see CAC ¶¶ 153, 154), leading to the planting of concealed third-party cookies (see CAC ¶¶ 153, 154, 156) and permitting Defendants' user information gathering in circumvention of the Safari default setting. *See* CAC ¶¶ 1 ("secret and unconsented-to" use of cookies); 3 (circumvention of "'do not track' privacy settings…to obtain PII without notice or permission"); 4 ("surreptitious circumvention of…privacy controls in order to obtain II without notice or permission"); 160 (Media never said "users consented to, or authorized, Media's secret negation" of Safari default setting); 222 (access to browser-managed files without or in excess of authorization); 224 (access to computers without or in excess of authorization).

Second, Defendants' hacking establishes Defendants' violation of the CFAA's access restrictions. *See Craigslist*, 2013 WL 1819999, at *4 (denying motion to dismiss CFAA claim where Defendants' continued use of Craiglist despite, *inter alia*, "the technological measures to block them constitutes unauthorized access under the statute" (citing *Facebook, Inc. v. Power Ventures,*

*Inc.* (Facebook II), 844 F. Supp. 2d 1025, 1038-39 (N.D. Cal. 2012), as "holding that 'circumvent[ing] technical barriers,' specifically, taking steps to evade the blocking of IP addresses, constitutes 'access[ing] the site 'without permission' and triggers liability under the CFAA.'")).

MIG and Vibrant Media argue that Plaintiffs granted them permission to access their computers for *some* purpose by requesting ads. That, they say, constituted permission for their undisclosed implanting of the third-party tracking cookies that Plaintiffs never asked for, never knew about, and believed their default settings blocked. For this absurd proposition they cite *LVRC Holdings, Inc. v. Brekka*, 581 F.3d 1127 (9th Cir. 2009). *Brekka* is entirely inapposite, on its summary judgment posture and, even more, on its dispositively different facts.

*Brekka* involved an employee of a residential treatment center for addicts who, before leaving the company "emailed a number of LVRC documents to his personal email account and his wife's personal email account." *Id*. at 1129-30. Completely different from Defendants' unauthorized and unknown outside-in hack of Plaintiffs' computers and browser files, Mr. Brekka "had authorization to use the LVRC computer" so "he did not access a computer 'without authorization.'" *Id*. at 1135. *Brekka* reflects the "narrow" view of CFAA liability applicable in the Ninth and Fourth Circuits in the "faithless employee" dispute setting that is irrelevant here. *See, e.g. JBCHoldings NY, LLC v. Pakter*, No. 12 Civ. 7555(PAE),

2013 WL 1149061, at *4-*5 (S.D.N.Y. Mar. 20, 2013) (contrasting "broad approach" of the First, Fifth, Seventh, and Eleventh Circuits holding "that the statutory terms 'without authorization' and/or 'exceeds authorized access' are broad enough to reach the situation in which an employee misuses employer information that he or she is otherwise permitted to access" with "narrow approach" of Fourth and Ninth Circuits holding "that the statute does not reach the mere misuse of employer information or violations of company use policies"). *Pakter* shows why Defendants here violated the CFAA: "There is no doubt that the CFAA applies to an 'outside' hacker who remotely enters a computer system without authority to do so." *Id*. at *4.

Appellees argue that Plaintiffs alleged no facts showing Defendants obtained or altered information without authorization.  But the CAC specifically alleges that Defendants' actions led to unpermitted secret tracking cookies (CAC ¶¶ 153-154, 156, 158, 161), and tracking cookies' central role in obtaining user information. CAC ¶¶ 38-40, 45-46, 78 (using Google as example). Defendants' claim that they only received "cookie values," see MIG/Vibrant Media Brief at 58, ignores the CAC's specific facts showing the fundamental information–user associational role cookies play in tracking.  Appellee's citation to *In re DoubleClick*, 154 F. Supp. 2d 497 in no way supports placement of cookies in deliberate violation of a default blocking setting.

### 2.     Aggregation of Losses

All parties seem to concede that if a hacker's conduct constitutes a "single act," multiple injuries can be aggregated under the CFAA to reach the $5,000 jurisdictional minimum.  However, Defendants MIG and Vibrant Media ( not Google) argue that aggregation of damages across multiple computers is a tool only available to federal law enforcement and private plaintiffs may only aggregate if the damage occurs on a single computer. Basing this argument on 14-year old and inherently unreliable legislative history rather than the statutory text, Defendants cite no cases endorsing this limitation.[8] All cases allowing aggregation make no distinction between law enforcement and private actions.  What matters is whether defendant's conduct can be deemed a "single act," which Plaintiffs' clearly alleged here. If the issue is unclear, it is factual and requires discovery.

The "no-aggregation" argument tramples the plain language of the statute. 18 U.S.C. § 1030(g) authorizes Plaintiffs' civil action under 18 U.S.C. § 1030(c)(4)(A)(i)(I) to recover:

> loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value.

---

[8]  In the trial court, Vibrant Media made this same argument and marshalled two inapposite cases in support.  Neither case was cited on appeal.

First, "aggregating" appears outside the government action parenthetical to which Appellees say that participle is confined. That plain language controls. Non-governmental plaintiffs are entitled to aggregate losses to meet the statutory minimum. Reaching that very result, the court in *Czech v. Wall Street on Demand, Inc*., Civil No. 09–180 (DWF/RLE), 2009 WL 2045308, at *3 (D. Minn. July 10, 2009) said: "[t]aking away the parenthetical, what remains is 'loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value.'"

Second, aggregation's permissibility for Plaintiffs is inherent in the rest of the provision's plain language. "[L]oss to 1 or more persons" necessarily entails aggregating the losses of those multiple persons. "[D]uring any 1-year period" necessarily entails aggregating the losses of those multiple persons over a one-year period. *See, e.g., Czech*, 2009 WL 2045308, at *3 (finding "plain reading" of CFAA permits private party aggregation of damages; "[t]he parenthetical…is limited to the United States and should not be read as imposing a limit upon any plaintiff other than the United States, especially in light of the definition of 'loss' that includes 'any reasonable cost to any victim.'").  It is inconceivable that "1 or more persons" may aggregate losses to meet the threshold, *but only if they jointly owned a single computer*.

Many well-reasoned cases show Plaintiffs can aggregate damages to reach the $5,000 threshold. *In re iPhone App. Litig*., No. 11–MD–02250–LHK, 2011 WL

4403963, at *11 (N. D. Cal. Sep. 20, 2011) and *In re DoubleClick*, 154 F. Supp. 2d

at 523, hold that "damages and losses under § 1030(e)(8)(A) may be aggregated

across victims and over time for a single act." *See also In re Apple & AT & TM*

*Antitrust Litig*., 596 F. Supp. 2d 1288, 1308 (N.D. Cal. 2008) (citing *In re Toys R*

*Us*, 2001 WL 34517252, at *11 for proposition that CFAA permits aggregation of

damages arising from same act by defendant); *Czech v. Wall Street on Demand,*

*Inc*., 674 F. Supp. 2d 1102, 1106 n.3 (D. Minn. 2009) (referring to *Czech*, 2009

WL 2045308, at *3, as rejecting "statutory interpretation argument" "that the

CFAA does not allow private plaintiffs…to reach the $5,000 loss threshold by

aggregating losses among multiple computers owned by multiple individuals").

"Liberally constru[ing]" the plaintiffs' allegations, the *In re Toys R Us* court found

sufficient CFAA allegations "that defendants caused an identical file to be

implanted on each of the plaintiffs' computers, resulting in damages of a uniform

nature." *In re Toys R. Us*, 2001 WL 34517252, at *1. Both that approach, and its

result, are correct here, too. *See also Mortensen* 2010 WL 5140454, at *7

(discussing *In re Toys R Us* and finding that because the "NebuAd Appliance" or

"cookie" "was distributed to all Plaintiffs, for purposes of a 12(b)(6) motion,

Plaintiffs' allegations of …damages, when aggregated across 'one or more

individuals' is sufficient to withstand a dismissal motion.").

No legitimate basis exists to resort to legislative history, which is unnecessary in light of the statute's plain language. *See, e.g., Mohamad v. Palestinian Authority, et al.*, 132 S. Ct. 1702, 1710 (2012) ("'reliance on legislative history is unnecessary in light of the statute's unambiguous language'" (quoting *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, n.3 (2010))); *see also Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 569 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material…," noting that "legislative history in particular is vulnerable to two serious criticisms" of "murky, ambiguous, and contradictory" elements in legislative history and "strategic manipulations of legislative history" by "unrepresentative committee members – or, worse yet, unelected staffers and lobbyists").

### 3.    Rule of Lenity

Appellees MIG and Vibrant Media (but not Google) argue that even if damages may be aggregated across multiple computers, the CFAA should not be enforced under the rule of lenity because the statute is "ambiguous" on this point. MIG/Vibrant Media Brief at 55.  However, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138–39, 118 S. Ct. 1911 (1998).  Rather, the rule only applies if "there is a

*grievous* ambiguity or uncertainty in the statute." *Id*. at 139, 118 S. Ct. at 1911 (quotation marks and citation omitted) (emphasis added). Furthermore, lenity "applies only if, after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended." *Reno v. Koray*, 515 U.S. 50, 65, 115 S. Ct. 2021 (1995) (quotation marks and citation omitted); *accord United States v. Balint*, 201 F.3d 928, 935 (7th Cir.2000) ("The rule of lenity is unavailable to us if the purported ambiguity in a statute can be resolved through normal methods of statutory construction.").

Defendants cite no case finding the CFAA (or Wiretap Act) "grievously" ambiguous. Furthermore, some federal privacy laws contain "good faith" exceptions in part to accommodate good faith misunderstandings of the law. So, for example, internet service providers have a good faith exception under 18 U.S.C. § 2511 when divulging customer's electronic communications. No such good faith exception appears in the CFAA. Nor should there be. The CFAA is aimed at deterring computer hacking. No ambiguity clouds the CFAA's prohibited conduct. Even under Appellees' formulation, the only ambiguity is whether damages may be aggregated. The rule of lenity does not excuse liability for actions that are unambiguously unlawful. See, e.g., *United States v. Litchfield*, 986 F.2d 21, 22 (2d Cir. 1993) ("Where statutory and regulatory provisions unambiguously cover the defendant's conduct, the rule does not come into play.").

### 4.     Allegations Specific to MIG and Vibrant Media

Finally, Defendants MIG and Vibrant Media incorrectly argue that the CAC fails to allege sufficient facts specific to them, as opposed to Google.  *See* MIG/Vibrant Media Brief at 44.  The  CAC alleges all elements of the CFAA claim necessary to sustain the claim against each Defendant.  The CAC's greater detail about Google's misconduct, and use of that misconduct an example of the other defendants' similar conduct (see, e.g., Appellants' Opening Brief at 9) amply suffices to give MIG and Vibrant "fair notice" of Plaintiffs' claim and the "grounds" on which it rests.  *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)**.**  These allegations suffice to raise the reasonable inference that discovery will reveal further factual support for the claim.  *Id*. at 237.  All three Defendants were also investigated and named in the same Stanford University study that first broke the news of the illegal tracking.  The CAC made clear that the allegation applied to all defendants.  CAC ¶ 77.  The CAC also made allegations independent of the Google+ platform; the allegations and claims do not depend on any plaintiff being Google+ member.

## VII.   PLAINTIFFS PLAUSIBLY PLED CALIFORNIA LAW CLAIMS

### A.    Plaintiffs Adequately Plead a Claim Under the California Unfair Competition Law

#### 1.   Plaintiffs Suffer Damages Because their Personally Identifiable Information Lost Value

Defendant Google alleges that Plaintiffs' California Unfair Competition Law ("UCL") claim fails because Plaintiffs cannot "establish a loss or deprivation of money or property sufficient to qualify as injury in fact." *Kwikset Corp. v. Sup. Court,* 246 P.3d 877, 885 (Cal. 2011).  Google further alleges that: (1) PII has no value; and (2) that Plaintiffs did not allege that they personally suffered monetary damage.  Google Answering Brief at 65-6.

At the pleading stage, Plaintiffs need only allege a loss of money to satisfy the UCL's damage requirement.  *Kwikset Corp.,* 246 P.3d at 888. ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice").  Google's arguments fail, and the trial court's dismissal was erroneous, because Plaintiffs' Complaint alleges: (1) a value to PII; and (2) that Plaintiff' suffered such a loss.  See CAC ¶¶ 240-50 (stating Plaintiffs suffered "lost money and/or property" as a result of Google's cookie placement that caused ""invasion of their privacy and the lost value of their personally identifiable information and other data").  Plaintiffs adequately allege that Google's actions

devalued Plaintiffs PII causing monetary harm sufficient to justify a claim under

the UCL.  CAC ¶¶ 49-67, 238-50.  These allegations suffice to defeat a motion to

dismiss.  Whether or not Google believes them to be true is irrelevant.  A motion to

dismiss deals solely with the existence of material facts in dispute.  Here, a fact is

in dispute – the value of Plaintiffs' PII – and the existence and import of that fact

create factual questions for discovery and trial.

### 2.  Plaintiffs Allege the Necessary Causation

Defendant Google first alleges that Plaintiffs cannot show causation because

they voluntarily sent their information to Google.  Plaintiffs' controlling well-

pleaded facts squarely contradict this factual argument.  Google ignores the

powerful inference to which Plaintiffs are entitled: Google's sophisticated hack

shows there was nothing voluntary in Plaintiffs' supply of information. Google

offers nothing to show the trial court erred in ruling in favor of Plaintiff on this

issue, finding Google was not a party to the communication.  *In re Google Inc.*

*Cookie Placement Consumer Priv. Litig.*, No. 12-2358, 2013 WL 5582866 at *4

(D. Del. October 9, 2013) (Google "bypassed the browser settings to place

cookies" and therefore received "different information in response to targeted

advertising than would have been sent without the setting of third-party cookies."

Thus, "Google is not appropriately deemed a party to the communications.")

Next, Google alleges that Plaintiffs cannot show their economic injury was

"caused by the unfair business practice or false advertising that is the gravamen of the claim" *Kwikset* at 885. *Kwikset* phrases this element of a UCL claim as requiring that a plaintiff "must demonstrate actual reliance on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions" *Kwikset*, at 888 (internal quotation omitted). Plaintiffs properly pled that: (1) "Google's website stated that 'Safari is set by default to block all third-party cookies;'" (2) "Google performed a number of steps to circumvent the Safari setting;" and (3) "In reasonable reliance on Google's misrepresentations and omissions, Plaintiffs interacted with various websites believing that this information was secure and confidential." CAC at ¶¶ 248-49. Thus, Plaintiffs properly pled this element of a UCL claim by alleging damages based on reliance on Google's misrepresentations and omissions.

## B.    Google's Conduct Is Unlawful, Fraudulent and/or Unfair

First, Google states that Plaintiffs cannot meet the unlawful prong because it is dependent on other claims and fails with those claims. However, the inverse is also true. Iif this Court reverses the trial court's dismissal and reinstates other claims or allows Plaintiffs to amend their Complaint, then Plaintiffs' claims under the UCL become viable again.

Second, Google states that Plaintiffs claim under the fraudulent prong fails because "it is based on an alleged misrepresentation that no Plaintiff alleges ever having viewed or relied upon."  Google Answering Brief at 68.  Google ignores the CAC.  Plaintiffs specifically alleged: "In reasonable reliance on Google's misrepresentations and omissions, Plaintiffs interacted with various websites believing that this information was secure and confidential."  CAC at ¶ 249 (emphasis added).

Finally, Google argues an action is "unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits".  Google Answering Brief at 68 (citing *McKell v. Washington Mut., Inc.* 49 Cal. Rptr. 3d 227, 240 (Cal. Ct. App. 2006)).  Google then says Plaintiffs cannot show a harm that outweighs the utility of Google's cookies.  This statement alone is as revealing as it is shocking. Google's cookies do nothing more than make Google a more effective advertiser and increase Google's revenues. Without tracking cookies, Google would still make money from online advertising.  Google would just have to do so with less targeted focus to its advertisements.

As for the completely factual utility-balancing argument, Google's secret tracking comes at the cost of invading Plaintiffs' privacy without consent and through unscrupulous means.  See CAC at ¶77 ("Google . . . tricked Safari [web

45

browsing software] into believing . . . that the user had submitted a form [permitting 3rd party cookies] . . . even though there was, in fact, no such form submitted by the actual user.").

No question should exist.  Personal privacy trumps profits obtained by deceit.  If a question about this balance of utilities exists, it is factual, requiring discovery and trial. Plaintiffs adequately pled this element of their UCL claim and accordingly, this Court should overturn the decision of the lower court.

### C.     Plaintiffs State Cognizable California Privacy Claims

Google asserts that Plaintiffs cannot assert claims under California constitutional and common law for invasion of privacy and intrusion upon seclusion because (1) they "cannot show that Google . . . invaded a legally private matter" (2) in a manner "highly offensive to a reasonable person" or "constituting a serious invasion of privacy."  (Google Br. at 58 (citing *Folgelstrom v. Lamps Plus, Inc.*, 125 Cal. Rptr. 3d 260, 264–65 (Ct. App. 2011)).)  Google is incorrect.

### 1. Plaintiffs stated an invasion into a legally private matter

"Legally recognized privacy interests [include] conducting personal activities without observation, intrusion, or interference . . . ."  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 35 (1994).  Plaintiffs have a legally protected right to be free from Google's "information gathering" and to conduct personal web browsing activities "without observation" by Google.  *Id.* at 21.

Moreover, Plaintiffs have alleged that Google intruded upon this legally protected matter by, among other things, intruding upon their personal decision making and/or personal activities by observing, intruding, or interfering with their various interactions with other Internet sites and intercepting and transmitting their personal information to Google without knowledge or consent.  (CAC ¶ 230.) Moreover, the district court did not make any determination that Plaintiffs failed to satisfy this element and, in fact, they did plausibly allege facts to satisfy an invasion into a legally private matter.

Google claims that because Plaintiffs "voluntarily sent" private matter to Google, it cannot be held to have invaded a private matter.  (Google Br. at 59.) But regardless of what, if any, information Plaintiffs may have "voluntarily sent" to Google, Plaintiffs did not authorize Google to invade the privacy of their homes to intercept private communications, track their private web browsing, or obtain and disclose such private information.  (CAC ¶ 230.)  Rather, Google intentionally undertook these actions and intruded on Plaintiffs' seclusion and private affairs.

**2.  Plaintiffs stated a serious or highly offensive invasion of their privacy**

Google argues that the district court's improper determination on the factual issue of whether Google's practices were "serious" or "highly offensive" invasions of privacy was proper because the practice of correlating information about

Internet users is "well-known and ubiquitous."[9]  (Google Br. at 61.)  But courts have repeatedly distinguished between private content and "noncontent data to which service providers must have access," finding a legitimate expectation of privacy in the former.  *United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008); *United States v. Forrester*, 512 F.3d 500, 510 n.6 (9th Cir. 2008) (explaining that a URL contains private content to which a user has an expectation of privacy because a "URL, unlike an IP address, identifies the particular document within a website that a person views and thus reveals much more information about the person's Internet activity").

Here, even if Plaintiffs voluntarily provided some information to Google, Plaintiffs did not authorize Google to intercept, track, record, and disseminate the content of their Internet communications.  (CAC ¶ 230.)  This conduct is undoubtedly highly offensive to a reasonable person, and Plaintiffs have alleged as much.  (*Id.* ¶ 230–31.)  The district court's fact finding on an incomplete record was improper.

### 3.  Plaintiffs State A Cognizable CLRA Claim

---

[9] Google also argued that "Plaintiffs do not even argue on appeal that Google's alleged conduct was a 'serious' or 'highly offensive' invasion of their privacy." (Google Br. at 61.)  Google fails to take note of Plaintiffs' opening appellate brief. (Plaintiff-Appellants' Opening Br. at 50 ("The District Court erred by resolving the factual question whether Google's conduct amounted to a serious invasion of privacy.").)

Google argues that Plaintiffs' CLRA claim is deficient for three reasons: (1) they do not allege a "tangible increased cost or burden" to satisfy CLRA standing; (2) there is no "transaction"; and (3) Plaintiffs did not state a claim involving a "good" or "service." (Google Br. at 63–65.) None of Google's arguments have merit.

### a. Plaintiffs meet CLRA standing requirements

Because Plaintiffs have alleged economic injury under the UCL, *see supra* p., Plaintiffs also satisfy standing requirements under the CLRA. *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013). The CLRA provides a cause of action to "[a]ny consumer who suffers *any damage*" as a result of any prohibited act under California Civil Code § 1770. Cal. Civ. Code § 1780(a) (emphasis added). "[T]he California Supreme Court has made clear that the CLRA's 'any damage' requirement is a capacious one . . . ." *Hinojos*, 718 F.3d at 1108. Thus, where a plaintiff adequately alleges economic injuries under the UCL, he also has standing under the CLRA.[10] *Id.*; *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1375 (where a plaintiff alleged an "economic injury" under the UCL he also adequately alleged injury under the CLRA).

---

[10] Moreover, California courts have recognized that "damage" in CLRA parlance is not synonymous with "actual damages," and may encompass "harms other than pecuniary damages." *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 156 (2010).

### b. Plaintiffs' use of websites to which Google supplied advertisements and implemented cookies constitutes a "transaction"

The CLRA applies to "transaction[s] intended to result or which result[] in the sale or lease of goods or services." Cal. Civ. Code § 1770(a). Google argues that Plaintiffs did not plead a "transaction" under the CLRA because Google provides its services "free to Plaintiffs." (Google Br. at 64.) But the CLRA does not require a transaction involving the exchange of cash, rather it requires a "transaction" in general, which Plaintiffs have alleged. (*See* CAC ¶ 49 (alleging PII is a form of "currency")); *see also* Cal. Civ. Code § 1761(e) (defining "transaction" and not specifying an exchange of currency as necessary). Thus, Plaintiffs use of websites containing Google-supplied advertisements and cookies qualify as a "transaction" under the CLRA, as no currency exchange is required and, even if it were, Plaintiffs allege such an exchange.

### c. Plaintiffs' allegations involve a "good" or "service" covered by the CLRA

Finally, Google argues and the district court incorrectly determined that "software and online services fall outside the 'goods' and 'services' covered by the CLRA." (Google Br. at 64 (internal citations omitted).) Contrary to Google's assertion that a bright-line rule applies banning application of the CLRA to software and related services, case law exists that supports the application of the

50

CLRA to electronic services.  *See, e.g.*, *Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1012 (D. Minn. 2012) ("Particularly because the Court must construe the CLRA broadly, the Court finds the [software] may provide the kind of service intended to fall within the [CLRA's] parameters.  This issue can be better addressed after [a motion to dismiss]."); *Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1109–13 (N.D. Cal. 2010) (applying the CLRA to AOL's Internet services including alleged privacy and security protections); *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1260 (2009) (holding that the CLRA applied to the sale of a mobile phone and wireless telephone service contract).  And, in any event, because determinations of whether software constitutes a "service" under the CLRA are often "close call[s]," *Ferrington v. McAfee, Inc.*, No. No. 10-cv-01455-LHK, 2010 WL 3910169, at *19 (N.D. Cal. Oct. 5, 2010), the district court's determination of this issue on a motion to dismiss was improper.

Moreover, software and online services constitute "goods" under the CLRA. *Perrine v. Sega of Am., Inc.*, No. C 13-01962-JSW, 2013 WL 6328489, at *4 (N.D. Cal. Oct. 3, 2013) ("[I]n certain circumstances, computer programs and software may be considered tangible goods or personal property.").  The *Ferrington* court recognized that, under California law, software appears to be treated as "tangible personal property for purposes of sales tax."  *Ferrington*, 2010 WL 3910169, at *19 (citing Cal. Rev. & Tax Code §§ 6006, 6010.9); *see also Navistar Int'l Transp.*

*Corp. v. State Bd. of Equalization*, 8 Cal. 4th 868, 874 (1994) (noting that

"California law imposes a tax on the retail sale of tangible personal property, but

not on the sale of intangible personal property," and upholding the imposition of

sales tax on software).  As there are no California state cases on point on this issue,

the district court's determination of this issue on a motion to dismiss was improper

and this question of fact should be reserved for the ultimate fact finder.

As such, at this early procedural stage of the case, Plaintiffs have adequately

alleged a CLRA claim.

## VIII.  CONCLUSION

For the reasons stated herein, Plaintiffs-Appellants respectfully ask this Court to reverse the findings of the District Court dismissing Plaintiffs' Consolidated Amended Complaint and to remand to the District Court with instructions to reinstate Plaintiffs' Consolidated Amended Complaint and for further proceedings as directed by this Court.

Respectfully submitted,

/s/ James P. Frickleton
**Bartimus, Frickleton, Robertson & Goza, P.C.**
James P. Frickleton
Edward D. Robertson, Jr.
Mary D. Winter
Edward D. Robertson, III
11150 Overbrook Rd., Suite 200
Leawood, KS  66211
913-266-2300
jimf@bflawfirm.com
chiprob@earthlink.net
marywinter@earthlink.net
krobertson@bflawfirm.com

## IX.    CERTIFICATION OF BAR MEMBERSHIP

Undersigned Counsel for Appellants, James P. Frickleton, has been admitted to the Court's bar to practice before it.

## X.    CERTIFICATION OF WORD COUNT

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,396 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).



This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ James P. Frickleton
**Bartimus, Frickleton, Robertson & Goza, P.C.**
James P. Frickleton
Edward D. Robertson, Jr.
Mary D. Winter
Edward D. Robertson, III
11150 Overbrook Rd., Suite 200
Leawood, KS  66211
913-266-2300
jimf@bflawfirm.com
chiprob@earthlink.net
marywinter@earthlink.net
krobertson@bflawfirm.com

April 25, 2014

## XI.    CERTIFICATE OF SERVICE UPON COUNSEL

I hereby certify that on April 25, 2014, I electronically filed the foregoing

using the Court's CM/ECF system, which sent a notification of such filing to the

following:

**Attorneys for MDL Plaintiff/ Appellant Class**

**<u>Lead Counsel / Executive Committee</u>**

**Stephen G. Grygiel DE ID #4944**
88 East Bergen Place
Red bank NJ 07701
407 505 9463
Sggrygiel@yahoo.com

**James P. Frickleton**
Bartimus Frickleton
Robertson & Goza PC
11150 Overbrook Road,
Suite 200
Leawood, KS 66211
913-266-2300
jimf@bflawfirm.com

**Edward D. Robertson, Jr.**
**Mary D. Winter**
Bartimus Frickleton
Robertson & Goza PC
715 Swifts Highway
Jefferson City, MO  65109
573-659-4454
chiprob@earthlink.net

marywinter@earthlink.net

**Brian Russell Strange**
Strange & Carpenter
12100 Wilshire Boulevard,
Suite 1900
Los Angeles, CA 90025
310-207-5055
lacounsel@earthlink.net

## Liaison Counsel

**David L. Finger**
Finger & Slanina LLC
One Commerce Center
1201 North Orange Street,
7th Floor
Wilmington, DE 19801-1186
(302) 573-2525
(302) 573-2524 (fax)
dfinger@delawgroup.com

## Attorneys for Appellees

**Michael H. Rubin**
Wilson Sonsini Goodrich &
Rosati                                              **Google Inc.**
650 Page Mill Road                  representing
Palo Alto, CA 94304-1050
650-493-9300
mrubin@wsgr.com


**Anthony J. Weibell**
Wilson Sonsini Goodrich &
Rosati                                              **Google Inc.**
650 Page Mill Road                  representing
Palo Alto, CA 94304-1050
650-493-9300
aweibell@wsgr.com


**Travis Steven Hunter**
Richards, Layton & Finger, PA
One Rodney Square
920 N. King Street                  representing        **Vibrant Media, Inc.**
Wilmington, DE 19801
302-651-7564
hunter@rlf.com


**Rudolf Koch**
Richards, Layton & Finger, PA
One Rodney Square                                  **Vibrant Media, Inc.**
920 N. King Street                  representing
Wilmington, DE 19801
302-651-7721
koch@rlf.com

| | | |
|---|---|---|
| **Joeann E. Walker**<br>jewalker@venable.com | representing | **Vibrant Media, Inc.** |

| | | |
|---|---|---|
| **Rodger Dallery Smith, II**<br>Morris, Nichols, Arsht &<br>Tunnell LLP<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, DE 19899<br>(302) 351-9205<br>rdsefiling@mnat.com | representing | **Media Innovation<br>Group, LLC** |

Also on this day, I sent 7 copies of the foregoing to the Office of the Clerk of

Court.

/s/ James P. Frickleton
**Bartimus, Frickleton, Robertson & Goza, P.C.**
James P. Frickleton
Edward D. Robertson, Jr.
Mary D. Winter
Edward D. Robertson, III
11150 Overbrook Rd., Suite 200
Leawood, KS  66211
913-266-2300
jimf@bflawfirm.com
chiprob@earthlink.net
marywinter@earthlink.net
krobertson@bflawfirm.com

April 25, 2014

## XII.   CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEFS

I certify that the E-Brief and Hard Copies of the brief are identical.

/s/ James P. Frickleton
**Bartimus, Frickleton, Robertson & Goza, P.C.**
James P. Frickleton
Edward D. Robertson, Jr.
Mary D. Winter
Edward D. Robertson, III
11150 Overbrook Rd., Suite 200
Leawood, KS  66211
913-266-2300
jimf@bflawfirm.com
chiprob@earthlink.net
marywinter@earthlink.net
krobertson@bflawfirm.com

April 25, 2014

## XIII.  CERTIFICATION OF VIRUS CHECK

I hereby certify that a virus check was performed on the E-Brief using

Norton Anti-Virus for Mac Version 12.6 and that no viruses were found.

/s/ James P. Frickleton
**Bartimus, Frickleton, Robertson & Goza, P.C.**
James P. Frickleton
Edward D. Robertson, Jr.
Mary D. Winter
Edward D. Robertson, III
11150 Overbrook Rd., Suite 200
Leawood, KS  66211
913-266-2300
jimf@bflawfirm.com
chiprob@earthlink.net
marywinter@earthlink.net
krobertson@bflawfirm.com

April 25, 2014